STATE v. JOHN QUINN.[1]

May 27, 1932.

No. 28,881.

*Hoffman & Burke* and *John De Courcy,* for appellant.

*Henry N. Benson,* Attorney General, and *Michael F. Kinkead,* County Attorney, for the state.

[1]Reported in 243 N. W. 70.

DIBELL, J.

The defendant was indicted for murder in the first degree. He was convicted of murder in the second degree. He appeals from the judgment of conviction.

■ The inexcusable or unjustifiable "killing of a human being is murder in the second degree, when committed with a design to effect the death of the person killed or of another, but without deliberation and premeditation." G. S. 1923 (2 Mason, 1927) § 10068.

A killing is justifiable when committed "in the lawful defense of the slayer, * * * when there is reasonable ground to apprehend a design on the part of the person slain to commit a felony, or to do some great personal injury to the slayer or to any such person, and there is imminent danger of such design being accomplished; or in the actual resistance of an attempt to commit a felony upon the slayer." G. S. 1923 (2 Mason, 1927) § 10089.

On March 19, 1931, about 10:30 in the evening, in the rear of the Green Lantern cafe on Wabasha street between Tenth street and College avenue in St. Paul, the defendant shot and killed Frank Ventress. He was indicted for murder in the first degree on April 10, 1931, along with one Frank Fay, his brother-in-law, who was not apprehended. After the killing he went to Canada, was arrested on May 1, 1931, and his trial was commenced in St. Paul on May 26, 1931. He claims that he killed in self-defense.

In the early evening the defendant was in a soft drink place at 985 West Seventh street owned by Harry L. Kremer. He had spent the day in Minneapolis with one Zip Royan, for whom he had worked two weeks past and who describes his business as that of a gambler. While at the West Seventh street place he received two or more telephone calls. He says that one was from his wife and that he made an appointment to meet her in an hour or so; and that one was from his brother-in-law, Frank Fay, who said something about having trouble with his wife and wanting him, Quinn, to go to Minneapolis with him. He promised to come downtown. Kremer drove him to the vicinity of the Green Lantern cafe, a few minutes' drive from the Seventh street resort, where they met Fay.

244

They finally walked north on Wabasha street toward the Green Lantern, and the defendant went into the lot in the rear for a purpose of his own, the lot being used to some extent for parking, perhaps largely in connection with the cafe into which there was an entrance. Kremer and Fay went in by the front or Wabasha street door. Ventress was there. There is evidence that he was of a quarrelsome disposition. He was accustomed to carrying a gun. He was a large man. He was something of a hanger-on at the place. The defendant approached the rear door from the outside. It opened, and he and Ventress faced each other. He knew Ventress by sight. He understood that he was quarrelsome and something of a gunman. It was dark. He says that Ventress applied a vile epithet to him and pulled a gun. He grappled with him, pulled the gun out of his hands, and after some struggling shot and killed him. He was asked and answered:

Q. "Now, at the time that you were confronted by Mr. Ventress there at the back door of the Green Lantern that evening and before you said you shot, why did you shoot?
A. "Well, I was afraid.
Q. "Afraid of what?
A. "Afraid he would kill me if I didn't."

According to Kremer, Quinn later in the evening said to Saph McKenna, who was in charge of the Hollyhocks, hereafter mentioned:

"I just shot a guy downtown. Saph said, 'What did you want to do that for?' He said, 'It was either a case of him getting me or I getting him, and I beat him to the draw.'"

He repeated this several times in similar language. He made some suggestions as to an alibi which would care for him and Kremer from 10 to 12.

It is in evidence that just shortly after, when in Minneapolis, Kremer, in telling what occurred at the Green Lantern cafe, said:

Q. "What statement did you make during the conversation held between Johnny Quinn, John Hurley, Sullivan, and yourself at the Sullivan home on the night of March 19th?

A. "Well, as I remember I said that—I tried to tell Hurley how it happened.

Q. "You tried to?

A. "Yes, and the way I seen it, and the way I thought I seen it, and I told him that when Quinn hit Ventress he sort of went down, and that as he fell I seen two shots fired, and I asked Johnny, or I asked Johnny, did you think he was going for a gun in his pocket, it looked to me that way, and he said yes, I thought so. So then we talked about his clothes and I says I used to live at the Biltmore, you throw the clothes in the furnace and get rid of them that way. We talked about the gun, and I said you might as well get rid of that gun because that is going to get you into trouble.

Q. "Did you tell him that, Harry?

A. "Yes.

Q. "Did you make that statement about the gun?

A. "I made the statement, yes.

Q. "Did or didn't you say, in the presence of Sullivan, Hurley, Mrs. Sullivan and Johnny Quinn, that this was a clear case of self-defense, and Johnny had to shoot?  *  *  *

A. "Yes, I did."

The defendant gives his account of the occurrence, and it is fair to state it:

Q. "And then when you got there what did you do?

A. "We all three got out.

Q. "You and who else?

A. "Royan and Kremer.

Q. "And where did you go to?

A. "Lyceum Cigar Store, across the street.

Q. "Do you know whether or not Mr. Kremer went into the Lyceum Cigar Store with you?

A. "I cannot state exactly—I am not quite sure about that.

Q. "Well, anyway you went into the Lyceum Cigar Store with Mr. Royan?

A. "Yes, sir.

Q. "What did you do after you got in there?

A. "Royan and I went in the back and Frank put on his hat and coat.

Q. "Then what happened?

A. "We walked out in the front. Frank Fay told me—asked me if I wanted to go to Minneapolis, he was having trouble with his wife, and I said I could not go, I have an appointment with my wife, and I had not eaten yet, let's go to Marge's and get some spaghetti.

Q. "Who do you mean by Marge?

A. "Mrs. Hurley.

Q. "That is your sister-in-law?

A. "Yes, sir.

Q. "When did you see Kremer, do you remember?

A. "Right in front of the cigar store, I remember walking out up to Marge's with him.

Q. "Then what happened?

A. "We walked as far as Tenth and Wabasha.

Q. "On what side of the street were you walking?

A. "That would be the west side.

Q. "And you went how far up?

A. "As far as Tenth and Wabasha.

Q. "Then what happened?

A. "At Tenth and Wabasha I said, 'You go and order some spaghetti, I will meet you inside, I am going in the rear to urinate.'

Q. "Did you leave them there?

A. "Yes, sir.

Q. "Then what happened?

A. "I went to the rear and urinated.

Q. "Then what happened?

A. "I started walking up towards the Lantern cafe, and as I got there the door opened up and there was a man standing there whom I knew, at the time, as Frank Van.

Q. "Then what happened?

A. "He had his hand like this here. He said to me, 'What are you doing here * * *?' and at that he went to pull a gun. I

grabbed the gun, turned it around, got the gun away from him.

Q. "Then what happened?

A. "I hit him.

Q. "Where did you hit him?

A. "I don't know, it seemed to me on the side of the head or top of the head.

Q. "Then what happened?

A. "He staggered back about a foot or so, and I went back about a half a foot, he gave another lunge for me and knocked me down, and when he knocked me down he came towards me and reached like this here, and I fired.

Q. "How big a man was Frank Van?

A. "Bigger than I was.

Q. "How often had you seen him before?

A. "Four or five times.

Q. "Had you ever seen him carrying a gun?

A. "I saw him one night getting a gun from behind the cigar counter.

Q. "Where were you when you saw him get the gun?

A. "At the front door.

Q. "And where did he get this gun from?

A. "Back of the cigar counter some place.

Q. "Do you know whether or not he worked there?

A. "Oh, I knew he was a kind of a bouncer around there, self-appointed.

Q. "Did you hear of trouble that he had been having with reference to gun play before?

A. "Yes, very pugnacious.

Q. "Had you heard of any episodes involving gun play in which he was involved?

A. "Several times.

Q. "Now, Mr. Quinn, do you know the general reputation of Mr. Ventress in the community where you were located—did you know it at the time?

A. "I knew he was very bad.

Q. "In what way—mention no specific case, but what was his reputation?

Mr. Kinkead: "That question is answered. He said his reputation is bad.

Q. "In what way do you mean by 'bad,' not mentioning any specific case?

A. "Well, he always carried a gun.

Q. "And what else?

A. "Very quarrelsome.

Q. "Was there anything else—with reference to his general reputation?

A. "A gunman and quarrelsome, that is about all.

Q. "Now, at the time that you were confronted by Mr. Ventress there at the back door of the Green Lantern that evening, and before you said you shot, why did you shoot?

A. "Well, I was afraid.

Q. "Afraid of what?

A. "Afraid he would kill me if I didn't.

Q. "When you fired that shot were you standing in an upright position or were you on the ground?

A. "I was on the ground—one knee on the ground.

Q. "And you shot up?

A. "I imagine at an angle, yes."

Harry L. Kremer and Harold J. White gave testimony more unfavorable to the defendant. Kremer says that Quinn received a telephone message while at his place on West Seventh street and wanted to be driven downtown. Quinn indicated, as Kremer says, that there was trouble downtown. He had been drinking in the last two or three hours. He claims that he was not greatly affected. Kremer says that as they drove down Zip Royan suggested to Quinn that if he had a pistol on his person not to use it, and Quinn replied that he would "take care of that"; and that Royan again suggested that he should not lose his head and if he had a pistol not to take it with him, and Quinn again replied he would "take care of that myself." Zip Royan denied it. The Kremer car was parked

a block and a half away from the Green Lantern. They met Fay on the street. Kremer says that he said that he had had trouble with someone, and Quinn said: "I'll take care of that, you go in the front way and order some booze, and I will be in the back when he comes out the back way. I will take care of him."

White testifies that he drove from Minneapolis in his car, reaching the Green Lantern shortly before the shooting, and parked back of the cafe. He was a fugitive from justice and had been found guilty or pleaded guilty of taking a bribe when a deputy sheriff. He claims to have witnessed an affray just shortly before the killing between Ventress, who was himself a large man, and another large man in the rear of the cafe. In the affray there was no shooting, and the men separated, one of them whom it is suggested was Fay, who said that he would get the other yet. It was a few minutes afterwards that Kremer's car came down with Quinn to Wabasha street. Kremer and Fay walked up the street to the cafe which was kept by Mrs. Hurley, a sister-in-law of Quinn and of Fay. Kremer says that Fay motioned Ventress to come to the rear, and when the door opened Quinn was there, the trouble commenced, and Quinn shot Ventress. White corroborates this testimony in part. He was in the back yard and saw part of the trouble going on and got excited and shot two or three times in the air with his own gun, and then started for Minneapolis in his car. Kremer and White were both in custody afterwards in charge of the police for a supposed connection with the killing. Naturally enough their interests were hostile to those of Quinn.

After the trouble Quinn fled the place and went to his apartment a few blocks away where he changed his clothing. Kremer drove around trying to find him but was unsuccessful and then drove to his own place on West Seventh street. Soon afterwards Quinn came in a cab. The police came but did not find him. A little later Kremer with Royan drove him to Minneapolis, where his mother and some other relatives lived. They stopped at the Hollyhocks, before mentioned, on the River Boulevard, where the talk between Quinn and Saph McKenna occurred. They went to Minneapolis

and returned about midnight to his place. Quinn stayed with Kremer's brother-in-law that night.

The importance of the testimony of Kremer, which it may be noted was generally and specifically denied by Zip Royan, who had to his discredit a long list of minor convictions, is in showing a premeditated design and therefore murder in the first degree if the jury cared to take it so. To some extent the testimony of White, if given credit, supported this theory. Kremer told different stories and changed them from time to time when examined by the officers. He admitted that he told different stories. He was looking out for himself. The jury might have disbelieved him wholly but was not required to do so. It might have believed a part of his testimony and rejected other parts. We have not named all of the witnesses. Most of them came from the Green Lantern cafe or were on the way to it or from it. It is not understood that upstanding and wholesome witnesses, men or women, were much frequenting such a place. The state and the defendant had to take the witnesses who had some knowledge of the occurrence, and there is where they found most of them. But from the discordant and contradictory testimony of such witnesses courts and juries usually are able to find the facts with fair confidence. It cannot be said that the verdict of guilty of murder in the second degree is not justified. If the jury believed all that Kremer said and all that White said, it more likely would have found guilt in the first degree. It apparently did not believe it all; and in this connection it is noted that Quinn's own testimony, casting aside that of Kremer and White, was sufficient to justify the jury in believing him guilty of second degree murder.

■ In considering the self-defense which Quinn claims, it is to be in mind that the burden of proof was not upon him to prove that he shot in self-defense. If upon the whole evidence bearing upon the shooting and his claim of self-defense there remained in the minds of the jurors a reasonable doubt of his guilt they should acquit. State v. McPherson, 114 Minn. 498, 131 N. W. 645; State v. McGrath, 119 Minn. 321, 138 N. W. 310; 2 Dunnell, Minn. Dig.

(2 ed.) § 245a. And this the court explicitly charged the jury. The jury indeed might have found that the defendant was not guilty of murder in the second degree but was guilty of manslaughter in the first as an unjustifiable and unintentional killing without a design to effect death under the provisions of G. S. 1923 (2 Mason, 1927) § 10073. This alternative was submitted.

■ The defendant claims that Kremer and White were accomplices and that Quinn could not be convicted on their uncorroborated testimony. It does not appear as a matter of law that they were. The most that can be said is that the jury might have found one or the other so. No requested instruction bearing upon such a situation was requested, and none was given. The situation was not such as to make it error to fail to give such an instruction in the absence of a request. Kremer's testimony put him in an unfavorable light when he started down from his place with Quinn and went into the cafe with Fay and when he concealed Quinn after the shooting; but even if the corroboration rule applies, it could go no farther than make it necessary to instruct the jury on corroboration and to leave it to say whether his testimony which it chose to believe was sufficiently corroborated. There was quite sufficient evidence, apart from that of Kremer and White, to convict Quinn of second degree murder; and, as before observed, Quinn's testimony alone, admitting that he killed Ventress as he says he did, would sustain a verdict of murder in the second degree; that is, a finding that the killing was not in self-defense.

■ The defendant claims that he was submitted to improper examination on the stand and a showing made of his prior associations which was prejudicial to him and unjustified.

The defendant was on the stand in his own behalf. He gave his history. He was borne at Belle Plaine in Minnesota. He had lived in Minnesota nearly all of his life. He was 32 years of age. He enlisted in the army in 1918. He was honorably discharged in 1919. He had contracted tubercular trouble in the war. He spent the next several years in the southwest because of tubercular trouble. He was in the Veterans Hospital in St. Paul in 1921. He occupied

various positions until in 1925, when he moved to Chicago. There he was employed by a transportation company as a driver's helper for two or three years. He later engaged in the cafe business, continued therein until July 1, 1930, and in January, 1931, returned to St. Paul. He had some trouble in connection with his cafe because of liquor traffic. At the time of the affray he was working for Zip Royan, the Minneapolis gambler, in his cigar store.

In the course of his examination the county attorney referred to his possible connection with the gangsters in Chicago. It was not established, and it was not pursued.

When the defendant went onto the stand and gave something of the history of his life, as it was proper he should, he could not object to unfavorable things being shown on cross-examination. It is quite clear that he was connected with unlawful liquor groups and familiar with their ways of doing. He could not become a witness, tell of things he thought favorable to himself, and insist that further he would be a stranger to the jury. His cross-examination was not carried so far as to be prejudicial error.

The case was submitted to the jury on a charge that was accurate and complete. It cannot be said that the defendant did not receive a fair trial. The verdict was not surprising, and there is nothing to justify urging that the jury went wrong. It might have found a higher degree of crime. It might have found manslaughter in the first degree. The verdict stands.

Judgment affirmed.